Rhonda H. Wills *(pro hac vice)*
rwills@rwillslawfirm.com
WILLS LAW FIRM, PLLC
1776 Yorktown, Suite 570
Houston, Texas 77056
Telephone: (713) 528-4455
Facsimile: (713) 528-2047

George P. Moschopoulos (SBN 249905)
georgem@logmapc.com
The Law Office of George Moschopoulos, APC
34197 Pacific Coast Highway, Suite 100
Dana Point, California 92629
Telephone: (714) 904-1669
Facsimile: (949) 272-0428

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOIS A. MANIGO, ORLANDO GUTIERREZ, PHILIP MARTINEZ, PATRICIA VALLADARES-GALLEGOS, SHANA GILMORE, AND WARREN V. NICHOLS, Individually and on Behalf of all Others Similarly Situated,<br><br>           Plaintiffs,<br><br>vs.<br><br>TIME WARNER CABLE, INC. and TWC ADMINISTRATION LLC,<br><br>           Defendants. | CASE NO.: 2:16-cv-06722-JFW-PLA<br><br>Hon. John F. Walter (Courtroom 7A)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[*Statement of Genuine Disputes of Material Fact; Separate Documents of Deposition Cites; Declaration of Rhonda H. Wills with Exhibits filed concurrently herewith*]<br><br>Date: October 16, 2017<br>Time: 1:30 p.m.<br>Place: Courtroom 7A<br>Pretrial Conference: October 27, 2017<br>Trial Date: November 14, 2017 |

# **TABLE OF CONTENTS**

I.      SUMMARY……………………………………………………………...1

II.     DISPUTED MATERIAL FACTS……………………………………….3

  A.   Plaintiffs' Complaint Alleges that Plaintiffs Regularly Performed Off-the-Clock Work for Which They Were Not Compensated. .................................. 3

  B.   Defendants "Suffered or Permitted" Off-the-Clock Work for Which Plaintiffs Were Not Compensated................................................. 4

  C.   There Is Ample Evidence to Support Meal and Rest Break Liability. .......... 7

III.    ARGUMENT & AUTHORITIES……………………………………….13

  A.   Defendants Have Failed to Satisfy Their Summary Judgment Burden with Respect to Plaintiffs' Off-the-Clock Claims................................................. 13

    1.   Plaintiffs properly pled their off-the-clock claims. .............................. 13

    2.   Defendants knew that Plaintiffs were working off-the-clock. ............. 16

  B.   Genuine Issues of Material Fact Exist with Respect to Plaintiffs' Meal and Rest Break Claims, Rendering Summary Judgment Inappropriate. ............ 18

    1.   There is a clear material factual dispute as to whether Defendants provided Plaintiffs the opportunity to take compliant meal breaks. .... 19

    2.   Defendants knew Plaintiffs were not provided the opportunity to take legally compliant meal breaks................................................. 21

    3.   Plaintiffs had no opportunity to take second meal breaks................... 22

    4.   Defendants knew that Plaintiffs were not provided with the opportunity to take legally compliant rest breaks. ................................................. 23

  C.   Summary Judgment on Plaintiffs' PAGA Claims Is Inappropriate............. 24

  D.   Summary Judgment on the Remainder of Plaintiffs' Claims Is Improper. . 25

IV.    CONCLUSION………………………………………………………….25

## TABLE OF AUTHORITIES

### CASES

*Alberts v. Aurora Behavioral Health Care*,
  241 Cal. App. 4th 388 (2015).......................................................................... 13

*Alcantar v. Hobart Serv.*,
  No. 11-1600, 2013 U.S. Dist. LEXIS 6752 (C.D. Cal. Jan. 15, 2013) ............ 19

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................ 21

*Boyd v. Bank of Am. Corp.*,
  109 F. Supp. 3d 1273 (C.D. Cal. 2015)........................................................... 19

*Brinker Rest. Corp. v. Superior Court*,
  53 Cal. 4th 1004 (2012)....................................................................... 19, 21, 24

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ........................................................................................ 13

*Garnett v. ADT, LLC*,
  139 F. Supp. 3d 1121 (E.D. Cal. 2015)........................................................... 24

*Gillings v. Time Warner Cable LLC*,
  583 Fed. App'x 712 (9th Cir. 2014)............................................................ 2, 15

*Grisham v. Philip Morris, Inc.*,
  670 F. Supp. 2d 1014 (C.D. Cal. 2009)........................................................... 15

*Hammitt v. Lumber Liquidators, Inc.*,
  19 F. Supp. 3d 989 (S.D. Cal. 2014) ............................................................... 21

*Harris v. Vector Mktg. Corp.*,
  No. 08-5198, 2010 U.S. Dist. LEXIS 5659 (N.D. Cal. Jan. 5, 2010).............. 25

*Hoffman v. Blattner Energy, Inc.*,
  315 F.R.D. 324 (C.D. Cal. 2016) .............................................................. 19, 24

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000).......................................................................... 15

*Pena v. Taylor Farms Pac., Inc.*,
  No. 2:13-cv-1282, 2015 U.S. Dist. LEXIS 13457 (E.D. Cal. Feb. 4, 2015) .... 14

*Pesci v. McDonald*,
    No. 5:15-cv-607, 2015 WL 12672094 (C.D. Cal. Oct. 22, 2015) .................... 14

*Ricaldai v. U.S. Investigation Servs., LLC*,
    878 F. Supp. 2d 1038 (C.D. Cal. 2012)........................................................ 19, 20

*Ross v. Ecolab Inc.*,
    No. 13-cv-5097, 2015 U.S. Dist. LEXIS 149037 (N.D. Cal. Nov. 3, 2015) .... 19

*Studley v. Alliance Healthcare Servs.*,
    No. 10-00067, 2012 U.S. Dist. LEXIS 190964 (C.D. Cal. July 26, 2012). 21, 22

*White v. Starbucks Corp.*,
    497 F. Supp. 2d 1080 (N.D. Cal. 2007) ........................................................ 17

*Willner v. Manpower, Inc.*,
    35 F. Supp. 3d 1116 (N.D. Cal. 2014) ........................................................ 24

*York v. Starbucks Corp.*,
    No. 08-07919, 2009 U.S. Dist. LEXIS 131489 (C.D. Cal. Dec. 3, 2009) ........ 17

*Zimmerman v. Comcast Corp.*,
    No. 2:15-cv-8224, 2016 U.S. Dist. LEXIS 162806 (C.D. Cal. Nov. 22, 2016) 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Lois A. Manigo, Orlando Gutierrez, Philip Martinez, Patricia Valladares-Gallegos, Shana Gilmore, and Warren V. Nichols (collectively "Plaintiffs") respectfully submit this Memorandum of Points and Authorities in Support of Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment:

## I.  SUMMARY

Plaintiffs loyally worked for Time Warner as non-exempt dispatchers in El Segundo, California for a combined 66 years.[1] On June 30, 2016, Plaintiffs—in the first lawsuit any of them had ever filed against an employer or former employer—filed a complaint in Los Angeles Superior Court seeking, *inter alia*, unpaid wages and related damages from Defendants Time Warner Cable Inc. and TWC Administration LLC ("Defendants" or "Time Warner"). *See generally* [Dkt. 1-3]. Specifically, Plaintiffs seek relief based on Defendants' failure to pay overtime wages, failure to provide legally compliant meal and rest breaks, failure to provide accurate itemized wage statements, failure to timely pay wages owed upon termination, and violations of the California Business and Professions Code and the California Private Attorneys General Act ("PAGA"). [Dkt. 1-3, at i]. Defendants now seek summary judgment on each and every one of Plaintiffs' claims,[2] asserting there are no material fact issues remaining. Contrary to these assertions, material fact issues remain as to each of Plaintiffs' claims. Defendants are not entitled to summary judgment on any of Plaintiffs' claims.

The record in this matter includes ample evidence that Plaintiffs were required to perform off-the-clock work before and after their scheduled shifts in the form of logging into and out of various computer software programs and shutting down and restarting their computers before and after clocking in and out of Defendants' Kronos

---

[1] Statement of Genuine Disputes of Material Fact ("SDF") ¶¶ 81–86 (Manigo—8 years; Gutierrez—9 years; Valladares—8 years; Martinez—14 years; Gilmore—9 years; Nichols—18 years).

[2] While Defendants purport to seek summary judgment on all of Plaintiffs' causes of action, as discussed herein, Defendants failed to move for summary judgment with respect to Plaintiffs' claims for unpaid second meal breaks. *See infra* Section III(B)(3).

timekeeping computer program and that Plaintiffs were required to work off-the-clock during uncompensated meal periods due to short staffing problems. Here, as in *Gillings v. Time Warner Cable LLC*, 583 Fed. App'x 712, 715 (9th Cir. 2014), Defendants are not entitled to summary judgment on plaintiffs' overtime claims for off-the-clock work.

Defendants attempt to mislead the Court, contending that Plaintiffs' Complaint "provides no hint that the grounds upon which the claims rest[] is a purported requirement that dispatchers work off the clock[.]" This is patently untrue, as Plaintiffs Complaint explicitly states that Plaintiffs "***were not paid overtime compensation for all off-the-clock work***." Defendants' further contention that the Court somehow "held" in its Order denying class certification that Plaintiffs failed to plead their off-the-clock claims is also false. An order denying summary judgment on Plaintiffs' off-the-clock claims would not be inconsistent with any of the Court's prior holdings.

Summary judgment on Plaintiffs' meal and rest break claims is also inappropriate because the record includes ample evidence that Plaintiffs were routinely required to begin meal breaks late and work during breaks, forego second meal breaks entirely, and skip or delay rest breaks due to a combination of short staffing and Defendants' requirement that dispatchers answer all incoming calls to the detriment of statutorily mandated meal and rest breaks. Perhaps most notably, Defendants' own witnesses have confirmed that they were aware of late break issues and that short staffing was a "frequent problem" that led to dispatchers taking late breaks and missing breaks. Plaintiffs have also provided clear deposition testimony that they were specifically instructed by supervisors to take late breaks due to short staffing issues and were sometimes required to work after their breaks had already commenced.

Moreover, Defendants have not moved for summary judgment as to Plaintiffs' second meal period claims regarding days when Plaintiffs worked more than ten hours. While some of these second meal periods were purportedly "waived"—*i.e.* Plaintiffs were forced to sign pre-completed meal break waivers—no valid waivers or meal penalty payments exist for many days in which Plaintiffs were required to work more

than ten hours without a second meal period. Defendants do not even attempt to address these facial violations of California law, and they are in no way entitled to summary judgment as to Plaintiffs' second meal periods. Further, Defendants are not entitled to summary judgement on Plaintiffs' Private Attorney General Act ("PAGA") claims, claims for waiting time penalties, claims for inaccurate itemized wage statements and for violations of California Unfair Competition Law.

Accordingly, and for the reasons explained in further detail below, summary judgment is improper, and Defendants' Motion should be denied in its entirety.

## II.    DISPUTED MATERIAL FACTS

**A.    Plaintiffs' Complaint Alleges that Plaintiffs Regularly Performed Off-the-Clock Work for Which They Were Not Compensated.**

Defendants assertion that Plaintiffs "abandoned" the overtime theory set forth in their Complaint is patently untrue. In their Complaint, Plaintiffs explicitly state that they "***were not paid overtime compensation for all off-the-clock work***." [Dkt. 1-3, ¶ 37] (emphasis added); *contra* [Dkt. 84-1, p. 3] (Defendants MSJ attempts to mislead the Court that Plaintiffs' Complaint "provides no hint that the grounds upon which the claims rest[] is a purported requirement that dispatchers work off the clock[.]"). Moreover, in their Interrogatory Responses each Plaintiff specifically avers to performing off-the-clock work for which they were not compensated. [SDF ¶ 106].

Even prior to filing their Complaint, Plaintiffs' PAGA notice states in the very first paragraph that "Time Warner failed to pay Plaintiffs overtime compensation for all off-the-clock work[.]" [Dkt. 84-8, p. 527]. Defendants' Notice of Removal also informs the Court that Plaintiffs' overtime claims are worth at least $2,965,931.53 (including putative class members). [Dkt. 1, p. 10]. Plaintiffs' October 21, 2016 Answers to Defendants' First Set of Interrogatories further identifies "[p]ersons with knowledge of Defendants' time and pay records and illegal policy of not compensating its employees for off-the-clock work." [SDF ¶ 106.] Similarly, in the Parties' December 20, 2016 Joint Stipulation Regarding Production of Class List Information, Plaintiffs

provide that "[d]uring their employment, Plaintiffs regularly performed off-the-clock work for which they were not compensated." [Dkt. 35, p. 1].

**B.    Defendants "Suffered or Permitted" Off-the-Clock Work for Which Plaintiffs Were Not Compensated.**

There is a litany of disputed material facts as to whether Defendants "suffered or permitted" off-the-clock work for which Plaintiffs were not compensated. Plaintiffs were required to arrive early to their scheduled shifts in order to load the computer programs prior to answering their first call, and Plaintiffs were required to wait for their computers to shut down and wait for programs to finish closing after they had already clocked out. Plaintiffs were also required to work off-the-clock during uncompensated meal breaks due to short staffing problems. Plaintiffs also testified they performed work duties off-the-clock pursuant to direct instructions from managers and supervisors:

**Patricia Valladares-Gallegos:** [SDF ¶¶ 66, 110, 114]

Q. What was your routine for loading programs and clocking in when you would show up in the morning, and let's start with the 5:00 shift?

A. You would have to come in and load the computer up because they want it to be turned off every night, and that can take up to 10 to 15 minutes just for it to boot and then you have to load each program up before you can clock in.          [* * *]

Q. Where did you get the understanding that you had to have everything else up before you could log into Avaya?

A. By the managers and supervisors. They say that everything has to be up and we have to be ready to take our first call by the time given.          [* * *]

A. Sometimes we're still working on our lunch breaks because of – we have to get certain things done and you can't do it while you're taking phone calls.

**Shana Gilmore:** [SDF ¶¶ 67, 69]

Q. So Nadine [dispatch manager] said in a management meeting to all of the dispatchers that were at that meeting, come in 15 minutes prior, load up all of your equipment – or all of your tools, and – so that you're ready to take the first call?

1   A. Be ready and prepared to take the first call at the start of your shift.

2   Q. And she also told you not to clock in while you were loading that equipment?

3   A. Yeah, you can't clock in 15 minutes prior.

4   Q. So they told you to do this work off-the-clock?

5   A. Yes.                                                          [* * *]

6   Q. Did you ever tell a supervisor or anyone else, other than the one occasion you've

7   mentioned, that I worked overtime and I'm not getting paid for it?

8   A. Well, yeah, because I made an argument all the time about the 15 minutes before

9   my shift, that's overtime that  I'm not getting paid for[.]                    [* * *]

10  Q. In a typical week, how much time do you think you weren't paid for work that

11  you did at the end of your  shift after you clocked out?

12  A. At least 20 minutes every day due to the load -- having to close out of everything.

13  Q. So it took 20 minutes to close out at the end of each day?

14  A. Yes, and you have to have your computer restarted, because if not, then that was

15  another thing you could get reprimanded for. If you left and your computer was

16  unlocked or not restarted, you can be reprimanded for that.              [* * *]

17  Q. [Manager] also told you not to clock in while you were loading that equipment?

18  A. Yeah, you can't clock in 15 minutes prior.

19  Q. Well, did Nadine [manager] say that, don't clock in?

20  A. Yeah[] and supervisors.

21  Q. So they told you to do this work off-the-clock?

22  A. Yes. You're to load up your systems and get prepared to work off-the-clock. You

23  can clock in 5 minutes before the start of your shift, but you're told to get to  work

24  15 minutes before the start of your shift.                          [* * *]

25  Q. What, other than a supervisor stopping you, caused you to work during lunch?

26  A. Several other things all instructed by a supervisor [including] giving out pool

27  calls [and] assigning work to a technician.

28  Q. And that would be because a supervisor stopped and asked you to do it?

1   A. Yes.

2   Q. What other things would supervisors ask you to do after you'd clocked out for

3   lunch?

4   A. You can send the e-mail, it could be an escalation, it could be[] several things.

5   **Philip Martinez:** [SDF ¶¶ 89, 111, 69]

6   Q. So this process that you are talking about of logging out of AVAYA [phone

7   program] and clocking out of Kronos [timekeeping program] and closing other

8   programs out, how long did that take typically?

9   A. 20 minutes.                                                    [* * *]

10  Q. So, when you report in the morning . . . how long would it take for the computer

11  to power-up where you could put your computer password in?

12  A. Again, I would say 15 to 20 minutes.                          [* * *]

13  A. Your supervisor used to call you over before you went to lunch.

14  Q. And you would have already clocked-out of Kronos?

15  A. Yes.

16  Q. How often did that happen?

17  A. I would say, again, like three times probably a week.

18  **Orlando Gutierrez:** [SDF ¶¶ 90, 109]

19  • Required to arrive to work 15 minutes prior to his scheduled shift in order to boot

20    up his computer and load all programs prior to clocking in.

21  • Instructed to wait for computer to complete shutting down after clocking out.

22  **Warren Nichols:** [SDF ¶¶ 91, 112, 102]

23  • Directed by supervisors and department manager to log out of Kronos

24    timekeeping system before shutting down other computer programs and seeks

25    unpaid overtime for such off-the-clock work.

26  • Required to work off-the-clock during meal breaks due to short staffing issues.

27  **Lois Manigo:** [SDF ¶¶ 92, 113]

28  • Required to start-up computer prior to clocking into Kronos timekeeping system.

- Instructed to clock out and then shut down her computer everyday while off-the-clock and not permitted to force close computer software after clocking out.

**C.      There Is Ample Evidence to Support Meal and Rest Break Liability.**

In addition to requiring Plaintiffs to work during their meal breaks, Defendants also *routinely* denied Plaintiffs the opportunity to take their first meal breaks within the first five hours of their shifts. [SDF ¶¶ 69–70]. The occurrence of late first meal breaks is evident upon examination of virtually any portion of Plaintiffs' time records. [SDF ¶ 107]. Taking these breaks late was <u>*not*</u> a consequence of Plaintiffs' own volition; rather, late breaks were the natural result of Defendants placing immense pressure on dispatchers to answer immediately any incoming calls and placing a priority on immediately servicing customers. [ SDF ¶¶ 69, 73]. Defendants maintained this practice and emphasized the importance of answering incoming calls above all else—and even ***<u>directly</u>*** instructed Plaintiffs to take their meal breaks late in order to continue answering calls. [SDF ¶¶ 65, 69, 71, 73]. This practice was exacerbated by short-staffing at the El Segundo location where Plaintiffs worked. [SDF ¶¶ 70–72].

**<u>Orlando Gutierrez:</u>** [SDF ¶ 100]

Q. What was your understanding about what you were supposed to do if there was no one else to  cover the phone and the meal break time came around?

A. To stay on the line until coverage, another employee would come back from whether it's a break or lunch to take over the calls or my team.

Q. Where did you get that understanding from?

A. Supervisors.

**<u>Lois Manigo:</u>** [SDF ¶ 101]

Q. Did you ever go to [supervisor] directly to talk about taking a late meal break?

A. Yes.

Q. And was it specific to a particular break or was it a general complaint?

A. It was just a general complaint.

Q. What did you tell her?

A. I said that I have to go to my lunch and she said that I have to complete what I finish [sic] because if not it would impact the rest of the day.                    [* * *]

Q. Sure. Do you have an understanding that Ms. Martinez [supervisor] is telling you, here, not to take your lunches late?

A. I was told by Ms. Martinez that I had to finish my work, regardless if my lunch was late or not.

**Warren Nichols:** [SDF ¶ 102]

Q. Did you ever tell a supervisor that part of your lunch that you were clocked out for on Kronos,[] that you actually did some work during that time?

A. Yes.

Q. What was the supervisor's response when you told them that you had worked while you were Kronosed out for lunch?

A. They wouldn't deal with those time issues and stuff because we were short staffed and they just did the best they could do as well under the circumstances. So they never really addressed it. It was like it just went under the table.

**Patricia Valladares-Gallegos:** [SDF ¶ 103]

Q. Was there a typical time your lunch was generally scheduled for or did it vary from day to day and week to week?

A. In[] the system it's supposed to be like 1:00, 1:30, but because of short staff they were making us take them later.

**Shana Gilmore:** [SDF ¶ 104]

Q. Was there ever a time where you took a meal break after you had been working five hours where your supervisor did not tell you to take your meal break late, where you just wound up taking it late?

A. They contradicted that, because they'll tell you, yes, you're supposed to take your lunch break on time, but they're also telling you, if a call comes in, you got to take that call; if those pool calls are there, those calls have to get out. So all that is going to cause you not to be able to go to lunch on time, which they know, or if

someone decides to call out, what is that going to do to my lunch break? I can't go

within the time I'm supposed to. . . due to department needs and your supervisor

telling you to change it, it gets changed.

**Philip Martinez:** [SDF ¶ 105]

Q. Under what circumstances would [meal break] be changed to be later in the day?

A. Over – not enough coverage.

Q. And by not enough coverage, you mean not enough dispatchers there to handle

the calls?

A. Yes.

Q. And then, how would the process go for that to change? Did your supervisor

have to do it?

A. Yes.

As demonstrated above, Plaintiffs testified that they were routinely required to

begin meal breaks late due to a combination of short staffing and Defendants' insistence

that dispatchers answer all incoming calls to the detriment of timely meal breaks.

Indeed, Defendants' own witnesses confirmed that short staffing was a "frequent

problem" that led to dispatchers taking late meal breaks: [SDF ¶ 70]

Q. Are you aware of any issues with respect to short staffing, not having enough

dispatchers?

A. Yes.

Q. Would short staffing be one of the reasons that would cause dispatchers to have

to work longer hours?

A. It could be. If someone in the later shift called out and you were the shift prior,

then that's a possibility.

Q. So the short staffing problems were frequent problems?

A. We have call-outs on a daily basis.

Q. So it was a frequent problem?

A. Yes.

When Plaintiffs' first meal breaks were taken late, Defendants allege that the Kronos timekeeping system automatically generated a meal break penalty payment. [SDF ¶ 60]. Yet Plaintiffs' Kronos records remain devoid of virtually any reference to such penalty payments; indeed, such penalties were frequently removed by supervisors. [SDF ¶ 88]. Defendants point to the payment of "more than 1,500 break premiums during the relevant period." [Dkt. 84-1, p. 21]. This reference is wholly inappropriate—it refers to penalties paid to the members of the putative class in an effort to inflate the inference of penalties paid to the Plaintiffs to persuade this Court that Defendants routinely paid such penalties. In reality, during the period beginning July 1, 2012 and ending in May 2016, Defendants cumulatively paid only 8 meal break penalties *in total* to five out of the six named Plaintiffs. [SDF ¶ 80]. This is evident from Defendants' own summary chart. [SDF ¶ 80].

During longer shifts, Plaintiffs also encountered issues with their statutorily mandated second meal periods. [SDF ¶ 64]. While some second meal periods were purportedly "waived"—*i.e.* Plaintiffs were forced to sign pre-completed meal break waivers—no waivers or meal penalty payments exist for many days in which Plaintiffs were required to work more than ten hours without a second meal period. [SDF ¶ 108].[3]

Plaintiffs encountered similar issues with their legally mandated rest breaks.

**Shana Gilmore:** [SDF ¶ 93]

Q. Your testimony is there were times when you could not take your rest break within those first five hours; correct?

A. Correct.

Q. All right. And if you couldn't take your rest break within the first five hours, were you supposed to tell your supervisor that?

---

[3] Pursuant to Magistrate Judge Abram's Order compelling Defendants to produce all meal break waivers purportedly signed by Plaintiffs during the relevant time period, [Dkt. 37, p. 9], the waivers produced by Defendants constitute all records of every meal period allegedly waived by each Plaintiff.

1   A. My supervisor is the one that instructed it.

2   **Lois Manigo:** [SDF ¶ 94]

3   Q. Was there ever a situation when you missed your rest break completely?

4   A. Yes.

5   Q. How often did that happen?

6   A. Quite often.                                                    [* * *]

7   Q. Did you ever complain to any of your supervisors about missing rest breaks?

8   A. Yes.

9   **Philip Martinez:** [SDF ¶ 95]

10  Q. So sometimes you wouldn't take your rest breaks at all?

11  A. No.

12  Q. How often would that happen on a weekly basis or monthly basis?

13  A. Again, I would say three, four -- three times out of the week.

14  Q. Now, when you would – when you did take a break, what would be the process?

15  Let's say you are on the phone on AVAYA with a call and your scheduled break is

16  coming up, what do you do to make sure you can take that break?

17  A. We couldn't – I had to finish the phone call before I take my break.

18  **Patricia Valladares-Gallegos:** [SDF ¶ 96]

19  Q. Were there ever times where you statused a rest break, representing you were on

20  a rest break and you worked the entire rest break?

21  A. Yes, because you have to get those things done, so it's not my choice to sit there

22  and work, we had to do it, otherwise things wouldn't get put into the system.

23  Sometimes we were overflowing with so many calls we couldn't get to the pool, so

24  you're doing it on your break.

25  **Orlando Gutierrez:** [SDF ¶ 97]

26  • Complained to supervisors that he was unable to start his rest breaks until after

27     his scheduled time due to short staffing.

28  **Warren Nichols:** [SDF ¶¶ 98, 99, 87]

Q. Were there ever times that you performed work during your rest breaks?

A. Yes.

A. That would happen frequently, almost daily. In the morning.

Q. And what would cause you to work during your rest breaks?

A. You have to clean up – I mean finish up, wrap up what you're doing. It could be a phone call. You may have to fill out a form, email. There were several things that you had to do which were follow up procedures[.]                    [* * *]

Q. Let's say you're on a phone call and you want to take your break after that call's over. While you're on that call, would you click on the rest break code in AVAYA so that when that call was over it would put you in break mode?

A. Yes.

Q. So with that ability while you're on phone calls, what would cause you to take your rest breaks late?

A. Well, because you were instructed not to do that. I mean that wasn't looked upon favorably.

Q. So what was the procedure you followed in order to take a rest break?

A. Most of the time to take a rest break I would wait for the opportunity to arise. . . [so] that there is coverage and – on the floor so that I could take the break and I had wrapped up whatever it was I was doing.

Defendants' own witness also testified that she was aware of these issues:

Q. How about rest periods? Are you aware of employees, dispatchers in particular, taking their rest periods late – their rest breaks late?

A. Dispatchers taking their rest breaks late? Yes.

Defendants' dispatch director, Edie Meyer, confirmed that dispatch department manager Nadine Solis was honest in testifying that short-staffing issues frequently led to late and missed breaks. [SDF ¶ 70].

Thus, there is ample testimony that Plaintiffs either did not have an opportunity to take rest breaks or that they were necessarily taken late. [SDF ¶¶ 74–75].

### III.   ARGUMENT & AUTHORITIES

**A.   Defendants Have Failed to Satisfy Their Summary Judgment Burden with Respect to Plaintiffs' Off-the-Clock Claims.**

**1.   Plaintiffs properly pled their off-the-clock claims.**

Defendants contend that Plaintiffs failed to plead their off-the-clock claims, and that this Court's Order denying class certification somehow operates as a ruling on the merits of Plaintiffs' claims. Contrary to Defendants' assertion, this Court did not previously "hold" in its order denying class certification that Plaintiffs failed to plead their off-the-clock claims—it simply denied Plaintiffs' Motion for Class Certification. [Dkt. 73, at 4–5, 10]. An adverse ruling on class certification is not a dismissal of a plaintiff's claims. *See, e.g.*, *Alberts v. Aurora Behavioral Health Care*, 241 Cal. App. 4th 388, 397 (2015) (a class certification motion is not an inquiry into the validity of the complaint's allegations); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974) (finding that neither the language or history of Rule 23 indicates that a certification ruling equates to an inquiry into the merits of a suit). Clearly, the Court's Order denying class certification did not rule that Plaintiffs' off-the-clock claims were unpled, because Defendants were not moving to dismiss or obtain summary judgment on those claims. An order denying summary judgment on Plaintiffs' off-the-clock claims would not be inconsistent with any of this Court's prior holdings.

More importantly, Plaintiffs pled their off-the-clock claims. In their Complaint, Plaintiffs *explicitly* state that they "***were not paid overtime compensation for all off-the-clock work***." [Dkt. 1-3, ¶ 37] (emphasis added). Further, Plaintiffs' Complaint specifically addresses off-the-clock work during uncompensated meal breaks. [Dkt. 1-3 at ¶¶ 25, 40(a)] ("Due to Time Warner's heavy call volume, Plaintiffs[] were forced to[] work during statutorily mandated meal periods and/or portions of meal periods[.]") These allegations directly contradict Defendants' assertion that "the Complaint provides no hint that the grounds upon which the claims rest[] is a purported requirement that dispatchers work off the clock". [Dkt. 84-1, at 3].

In addition to the allegations raised in Plaintiffs' Complaint, Defendants had ample notice of Plaintiffs' off-the-clock claims during the early stages of this litigation. Even prior to filing their Complaint, Plaintiffs' PAGA notice states in the very first paragraph that "Time Warner failed to pay Plaintiffs overtime compensation for all off-the-clock work[.]" [Dkt. 84-8, p. 527]. Defendants' Notice of Removal also informs the Court that Plaintiffs' overtime claims are worth at least $2,965,931.53 (including putative class members). [Dkt. 1, p. 10]. Plaintiffs' October 21, 2016 Answers to Defendants' First Set of Interrogatories further identifies "[p]ersons with knowledge of Defendants' time and pay records and illegal policy of not compensating its employees for off-the-clock work." [SDF ¶ 106]. Similarly, in the Parties' December 20, 2016 Joint Stipulation Regarding Production of Class List Information, Plaintiffs provide that "[d]uring their employment, Plaintiffs regularly performed off-the-clock work for which they were not compensated." [Dkt. 35, p. 1].

The Central District of California's opinion in *Pesci v. McDonald*, No. 5:15-cv-607, 2015 WL 12672094, at *11 (C.D. Cal. Oct. 22, 2015) is pertinent to the Court's analysis. In *Pesci*, the plaintiff initially alleged only unpaid pre-shift work as a basis for her FLSA claim, and the defendant moved for summary judgment. *Id.* In her response, the plaintiff asserted she also worked nearly 25 to 45 minutes every day after her shifts—a fact that, while unpled, came to light during discovery and her deposition. *Id.* The defendant argued the new allegation was barred, asserting Pesci failed to allege the post-shift work. *Id.* The Central District disagreed, noting that while she did not allege post-shift work in her complaint, Pesci testified in her deposition that she was routinely required to work 15 to 30 minutes after her shift on a daily basis and was not compensated. *Id.* "Because these allegations arose prior to the close of discovery, the Court [found] that Defendant had adequate notice of Pesci's allegations of uncompensated working time after her shifts." *Id.*

The Eastern District's opinion in *Pena v. Taylor Farms Pac., Inc.*, No. 2:13-cv-1282, 2015 U.S. Dist. LEXIS 13457 (E.D. Cal. Feb. 4, 2015) is also informative. In

*Pena*, the employer argued that the plaintiff-employee "did not adequately claim damages for off-the-clock work." *Id.* at *12. The court disagreed, noting that this was "belied by [plaintiff's] interrogatory responses saying that defendant failed to offer legally compliant meal and rest breaks, and failed to pay for all hours worked." *Id.* The court denied the employer's motion for summary judgment as to the off-the-clock claims. *Id.* (citing *Gillings v. Time Warner Cable LLC*, 583 Fed. App'x 712, 715 (9th Cir. 2014)) (holding improper the grant of Time Warner's motion for summary judgment on plaintiffs' overtime claims for pre- and post-shift off-the-clock work).

With respect to the Federal Rules of Civil Procedure's pleading requirements, "the Ninth Circuit has 'repeatedly stressed that the court must remain guided by the underlying purpose of Rule 15 … to facilitate decision on the merits, rather than on the pleadings or technicalities.'" *Grisham v. Philip Morris, Inc.*, 670 F. Supp. 2d 1014, 1023 (C.D. Cal. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)). The Central District's opinion in *Grisham* explained, "there is clear authority that [a]n addition of new issues during the pendency of a summary judgment motion can be treated as a motion for leave to amend the complaint." *Id.*

Here, Defendants argument that they did not have fair notice of Plaintiffs' off-the-clock claims fails, because the precise nature of Plaintiffs' pre- and post-shift work allegations has been abundantly clear since the early stages of the discovery period. Further, Plaintiffs' Complaint specifically addresses off-the-clock work during uncompensated meal breaks. [Dkt. 1-3 at ¶¶ 25, 40(a)] ("Due to Time Warner's heavy call volume, Plaintiffs[] were forced to[] work during statutorily mandated meal periods and/or portions of meal periods[.]") Plaintiffs in no way raise a new theory of liability in their opposition to summary judgment. The *Pesci* and *Pena* cases are precisely analogous to this matter. In addition to the instances cited above, Plaintiff Shana Gilmore (the first individual to be deposed in this case) testified in her December 13, 2016 deposition *at length* about her pre- and post-shift duties. [*See, e.g.*, SDF ¶ 67]. The deposition of Warren Nichols, the last Plaintiff to be deposed, occurred

approximately *eight months ago* on January 25, 2017. Defendants' witnesses, Nadine Solis (individually and as corporate representative) and Edie Meyer, were deposed on January 11, 2017, January 30, 2017, and January 12, 2017. Defendants had ample notice of Plaintiffs' pre- and post-shift allegations during this deposition period, and questioned each Plaintiff (including Ms. Gilmore) at length about these allegations.

To grant summary judgment in favor of Defendants merely because Plaintiffs' Complaint did not include the phrase "pre- and post-shift work" in conjunction with their Complaint's unambiguous statement that Plaintiffs "were not paid overtime compensation for all off-the-clock work" would undermine the tenet that courts should "facilitate decisions on the merits of cases, rather than on the pleadings or technicalities." *Id.* Because Defendants had ample notice of all precise details regarding Plaintiffs' pre- and post-shift work allegations throughout the discovery period in this case, granting summary judgment as to these claims is improper.

Finally, Defendants' statement that Plaintiffs should have moved for leave to amend their Complaint to include further specificity as to their off-the-clock claims is improper. Pursuant to this Court's Scheduling and Case Management Order, Plaintiffs' deadline to seek leave to amend their Complaint was on November 1, 2016. [Dkt. 20, at 7]. Defendants never moved to dismiss *any* of Plaintiffs' claims. Rather, Defendants waited until February 21, 2017—well after this Court's deadline for Plaintiffs to seek leave to amend their Complaint—to challenge Plaintiffs' pleadings (improperly) in their Opposition to Plaintiffs' Motion for Class Certification. Here, as in *Pena* and *Pesci*, Defendants had fair notice of Plaintiffs' claims for off-the-clock work throughout the discovery period in this case, and Defendants are not entitled to summary judgment on Plaintiffs' off-the-clock claims.

### 2. Defendants knew that Plaintiffs were working off-the-clock.

Defendants further assert that there is no evidence they "suffered or permitted" Plaintiffs to work off-the-clock, and that any off-the-clock work performed by Plaintiffs was done so in contravention to Defendants' written policies. On the contrary, material

1  fact issues remain as to whether Defendants "suffered or permitted" such work and

2  whether Defendants maintained a *de facto* policy of requiring such work.

3     To prevail on an off-the-clock claim, a plaintiff must demonstrate that an

4  employer had actual or constructive knowledge of the plaintiff's alleged off-the-clock

5  work. *See York v. Starbucks Corp.*, No. 08-07919, 2009 U.S. Dist. LEXIS 131489, at

6  *8 (C.D. Cal. Dec. 3, 2009)*. At the summary judgment stage, Plaintiffs "must

7  demonstrate a genuine issue of material fact regarding whether Defendants 'had actual

8  or constructive knowledge of [the] alleged off-the-clock work.'" *Id.* (quoting *White v.*

9  *Starbucks Corp.*, 497 F. Supp. 2d 1080, 1083 (N.D. Cal. 2007)).

10    In *York*, the plaintiff claimed she performed work duties off-the-clock for which

11 she was not compensated when working as a barista for Starbucks. *York*, 2009 U.S.

12 Dist. LEXIS 131489 at *9. She was required to record the hours she worked, and was

13 permitted to correct her time entries if she forgot to properly record all hours worked.

14 *Id.* Moreover, if she complained and sought payment for uncompensated time in

15 writing, she was paid for the uncompensated time. *Id.* Starbucks moved for summary

16 judgment on York's off-the-clock claims, but the Central District denied Starbucks'

17 motion on the basis that material fact issues existed. *Id.* at *11. Specifically, the

18 plaintiff's testimony revealed that she was requested to perform work off-the-clock by

19 her managers (both before and after her shifts and during her meal and rest breaks), and

20 that managers made it known that recording off-the-clock time was not acceptable. *Id.*

21 at *10. The court noted, "[t]hese and other statements suggest that Defendants, through

22 their managers, could have had actual or constructive knowledge that Plaintiff was

23 working off the clock, or that management failed to 'exercise its control and see that

24 the work [was] not performed.'" *Id.* at *11. Thus, the Central District held that the

25 plaintiff established a genuine issue of material fact, precluding summary judgment. *Id.*

26    The record in this matter includes ample testimony to establish that Defendants

27 had actual or constructive knowledge that Plaintiffs performed work duties off-the-

28 clock. Plaintiff Shana Gilmore testified that dispatcher department manager Nadine

Solis explicitly told her and other dispatchers to come in early and prepare all necessary work programs and tools prior to clocking in, so that they could begin receiving calls immediately when their scheduled shift began. [SDF ¶ 76; *see also* SDF ¶ 68]. Ms. Valladares-Gallegos testified that supervisors required her to log into other programs prior to clocking in, and that doing so required showing up to work approximately 15 minutes early every day. [SDF ¶ 77]. Plaintiff Orlando Gutierrez testified that he spent approximately 15 minutes per day loading programs prior to clocking in due to IT issues, and that his supervisors were aware of these issues. [SDF ¶ 78]. Warren Nichols testified that he was told by his supervisors and dispatch manager that he was supposed to clock out before logging out of his computer programs after his shift every day. [SDF ¶ 79]. Plaintiff Lois Manigo testified that she was instructed by supervisors to clock out and then shut down her computer while off-the-clock and to start-up her computer prior to clocking in every day. [SDF ¶ 92].  Plaintiff Philip Martinez testified that he spent approximately 15 to 20 minutes per day loading programs prior to clocking in due to IT issues, and that his supervisors were aware of these issues. [SDF ¶ 89]. As discussed in Section II(B), Plaintiffs were required to work during uncompensated meal periods.

**B.  Genuine Issues of Material Fact Exist with Respect to Plaintiffs' Meal and Rest Break Claims, Rendering Summary Judgment Inappropriate.**

Defendants move for summary judgment on Plaintiffs' meal break claims and rest break claims on similar grounds. Specifically, Defendants assert that the "undisputed facts" show that they provided Plaintiffs the opportunity to take meal and rest breaks, and that they are entitled to summary judgment under the *Brinker* standard. Alternatively, Defendants also assert that there is no evidence that they knew Plaintiffs were not provided with the opportunity to take their meal and rest breaks. Material fact issues exist as to both of these assertions, and summary judgment is not appropriate.

1. **There is a clear material factual dispute as to whether Defendants provided Plaintiffs the opportunity to take compliant meal breaks.**

California law requires employers to provide nonexempt employees meal periods and rest periods during the workday. *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1018 (2012). Importantly, "[a]n employer cannot contravene an official meal or rest break policy by imposing an informal practice that impedes or discourages its employees from taking compliant breaks." *Hoffman v. Blattner Energy, Inc.*, 315 F.R.D. 324, 337 (C.D. Cal. 2016). "[A] formal policy will not be controlling where it is otherwise shown that an employer pressured or coerced employees to skip breaks." *Boyd v. Bank of Am. Corp.*, 109 F. Supp. 3d 1273, 1306 (C.D. Cal. 2015). "[I]f an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided." *Ross v. Ecolab Inc.*, No. 13-cv-5097, 2015 U.S. Dist. LEXIS 149037, at *5 (N.D. Cal. Nov. 3, 2015) (citing *Alcantar v. Hobart Serv.*, No. 11-1600, 2013 U.S. Dist. LEXIS 6752, at *5 (C.D. Cal. Jan. 15, 2013); *Ricaldai v. U.S. Investigation Servs., LLC*, 878 F. Supp. 2d 1038, 1043 (C.D. Cal. 2012)).

The case of *Zimmerman v. Comcast Corp.*, No. 2:15-cv-8224, 2016 U.S. Dist. LEXIS 162806 (C.D. Cal. Nov. 22, 2016) is instructive as to this standard. In *Zimmerman*, Comcast's written policies required the plaintiffs to take a half-hour meal break for every five hours worked. *Id.* at *3. The plaintiffs brought claims against Comcast for, *inter alia*, denying meal and rest breaks. *Id.* at *20. Comcast asserted the plaintiffs were provided with the opportunity and incentivized through various means to take their meal breaks in a timely manner. *Id.* at *20–21. The Central District held there was a fact issue that precluded summary judgment, and interpreted the *Brinker* standard. *Id.* at *21–22. Specifically, the *Zimmerman* court emphasized that "*Brinker* specifically recognized that an employer can undermine an officially compliant break policy by pressuring or incentivizing employees to delay or forgo such breaks." *Id.* at *26. The court was presented with the following evidence: (1) plaintiffs' testimony that

there were several occasions where they were unable to take an uninterrupted 30-minute meal break within the first five hours of their shift because they were in the middle of a job; and (2) plaintiffs' testimony that they were instructed to delay the start of their breaks because "the customers come first." *Id.* at *24. Finding material fact issues precluded summary judgment, the court further noted that "an employer does not *ipso facto* comply with meal break requirements just because a supervisor did not explicitly instruct an employee not to take their meal break." *Id.* at *26.

As was the case in *Zimmerman*, the testimony and documentary evidence presented here clearly indicates there are material fact issues remaining as to whether Plaintiffs were provided the opportunity to take their meal breaks. While Defendants point to the employee handbook, as shown in Section II(C) above, Plaintiffs have repeatedly testified that Defendants maintained a *de facto* policy of requiring Plaintiffs begin their first meal periods late, work during meal periods, and skip meal periods.

Defendants claim they were not required under the law to "police" the dispatchers and ensure that Plaintiffs took their meal breaks in a timely manner. But this assertion ignores the fact that Defendants <u>were</u> obligated to refrain from pressuring Plaintiffs to continue answering phone calls at the expense of a timely meal break.

Furthermore, Plaintiffs' time records show a litany of instances where meal breaks were not taken within the first five hours of a shift, and where no meal break penalties were provided. [SDF ¶ 107]. These time records create a legal presumption that Plaintiffs were not relieved of duty and provided a meal break within a timely manner. *See Ricaldai*, 878 F. Supp. 2d at 1043. Defendants claim that they paid "more than 1500 break premiums during the relevant period." [Dkt. 84-1, p. 21]. This number is grossly misleading, as it encompasses irrelevant penalties paid to **97** El Segundo dispatchers during the relevant time period, as opposed to the six Plaintiffs themselves. In fact, Plaintiffs received a grand total of **34** meal break penalties over a four-year period, 26 of which were paid to a single Plaintiff, Lois Manigo. [SDF ¶80]. ***Defendants cumulatively paid only 8 meal break penalties to five of the six named***

1   ***Plaintiffs during the period beginning July 2012 and ending May 2016.*** [SDF ¶ 80].

2       Thus, material fact issues remain as to whether Defendants provided Plaintiffs

3   the opportunity to take legally compliant meal breaks based on their *de facto* policy.

4       **2.    Defendants knew Plaintiffs were not provided the opportunity to take**

5           **legally compliant meal breaks.**

6       Defendants alternatively assert they are entitled to summary judgment with

7   respect to Plaintiffs' meal break claims on the basis that there are no material fact issues

8   as to whether Defendants had knowledge that Plaintiffs were not provided with the

9   opportunity to take timely meal breaks. An employer's duty with respect to meal breaks

10  is satisfied only "if it relieves its employees of all duty, relinquishes control over their

11  activities and permits them a reasonable opportunity to take an uninterrupted 30-minute

12  break, and does not impede or discourage them from doing so." *Brinker*, 53 Cal. 4th at

13  1040; *see also Studley v. Alliance Healthcare Servs.*, No. 10-00067, 2012 U.S. Dist.

14  LEXIS 190964, at *6 (C.D. Cal. July 26, 2012).

15      In *Hammitt v. Lumber Liquidators, Inc.*, 19 F. Supp. 3d 989, 998–99 (S.D. Cal.

16  2014), the employer moved for summary judgment and argued that employees were

17  provided with uninterrupted meal breaks, while the plaintiff-employee asserted that the

18  employer established a work culture that prohibited uninterrupted meal periods. The

19  court was presented with conflicting testimony from the parties. While plaintiff testified

20  that it was "his decision" to forgo meal periods and defendants testified management

21  was never informed of non-compliant meal breaks, the plaintiff's testimony also

22  showed that he was never able to stop working for a 30-minute meal break. *Id.* at 999.

23  The court denied summary judgment, noting that "[o]n a motion for summary

24  judgment, the Court may not weigh this conflicting evidence" as to these material fact

25  issues. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

26      Where genuine issues of material fact exist as to whether an employer fulfilled

27  its obligations to provide compliant meal breaks by fully relieving employees of their

28  duties, relinquishing control over their activities, and permitting employees reasonable

opportunities to take their breaks, summary judgment is not proper. *See Studley*, 2012 U.S. Dist. LEXIS 190964 at *6–7. Such material fact issues certainly exist here. Plaintiff Shana Gilmore testified that she only took meal breaks late when supervisors told her to do so, or when calls came in shortly before her meal break—calls that supervisors told her she was required to take. [SDF ¶ 73]. Philip Martinez testified he was sometimes told by supervisors to take a late lunch due to coverage issues, and that he was sometimes required to assist supervisors with questions after his meal break had already "commenced." [SDF ¶ 71; *see also* SDF ¶ 72]. Perhaps most notably, Defendants' own witness, Nadine Solis, confirmed she was aware of short staffing and late break issues, and both Ms. Solis and Edie Meyer confirmed that short staffing would result in dispatchers being required to take late meal breaks. [SDF ¶ 70].

### 3. Plaintiffs had no opportunity to take second meal breaks.

Defendants are in no way entitled to summary judgment as to Plaintiffs' second meal periods, because Defendants have not moved for summary judgment as to these claims. In fact, Defendants' Motion completely ignores the issue of Plaintiffs' second meal periods, to which Plaintiffs were entitled when they worked more than ten hours in a work day. Plaintiffs' deposition testimony as to Defendants' *de facto* meal break policies and supervisors' directions to continue working into their meal periods to answer incoming calls is not exclusive to the meal periods Plaintiffs were entitled to for the first five consecutive hours of their shifts. These instructions were equally applicable to Plaintiffs' second meal periods.

While some of these second meal periods were purportedly "waived"—*i.e.* Plaintiffs were forced to sign pre-completed meal break waivers—no waivers or meal penalty payments exist for many days in which Plaintiffs were required to work more than ten hours without a second meal period. [SDF ¶ 108].[4] Indeed, it is decidedly <u>not</u>

---

[4] Pursuant to Magistrate Judge Abram's Order compelling Defendants to produce all meal break waivers purportedly signed by Plaintiffs during the relevant time period,

the case that a signed waiver exists for each instance that Plaintiffs allegedly waived the meal period. For instances, on <u>64</u> occasions during the relevant time period, Plaintiff Manigo neither received a meal penalty payment *nor* signed a meal period waiver on days in which she was required to skip her second meal period after working more than 10 hours per day. Likewise, <u>77</u> such instances exist in the record for Plaintiff Valladares-Gallegos, and <u>5</u> such instances of unauthorized meal period waivers exist for Plaintiff Gilmore. [SDF ¶ 108].

Defendants attempt to obtain summary judgment as to Plaintiffs' meal break claims without even mentioning their claims for unpaid second meal breaks. Defendants are in no way entitled to summary judgment as to Plaintiffs' second meal periods, because Defendants have not moved for summary judgment as to these claims. Moreover, material fact issues remain as to whether Plaintiffs were provided with the opportunity to take second meal periods and whether Plaintiffs were paid the requisite penalty for the instances in which a purported meal break waiver appears on their time records but where no such valid waiver, in fact, even exists.

### 4. Defendants knew that Plaintiffs were not provided with the opportunity to take legally compliant rest breaks.

As to Plaintiffs' rest break claims, Defendants make essentially the same arguments made with respect to Plaintiffs' meal break claims. Defendants claim they are entitled to summary judgment with respect to Plaintiffs' rest break claims on the alleged basis that (1) they provided Plaintiffs with the opportunity to take their rest breaks, or, alternatively, (2) there is no evidence showing they were aware that Plaintiffs were not provided with such opportunities. However, as with Plaintiffs' meal break claims, there remain ample material factual issues that preclude summary judgment as to their rest break claims with respect to each of these contentions. Defendants also do not even suggest that Plaintiffs were paid any penalties for rest

---

[Dkt. 37, p. 9], the waivers produced by Defendants constitute all records of every meal period allegedly waived by each Plaintiff.

period violations. At a minimum, material fact issues remain as to whether Defendants provided Plaintiffs the opportunity to take legally required rest breaks. Employers are obligated to provide employees uninterrupted rest periods pursuant to Cal. Labor Code § 226.7. *See also Brinker*, 53 Cal. 4th at 1018. As with meal breaks, employers may not pressure employees to work during rest periods. *See Hoffman*, 315 F.R.D. at 337.

As shown in Section II(C) above, the testimony as to this issue demonstrates that Defendants frequently failed to provide Plaintiffs the opportunity to take uninterrupted rest breaks and that supervisors were aware Plaintiffs were unable to take their rest breaks. At a minimum, material fact issues exist as to whether Defendants were aware that Plaintiffs were not provided the opportunity to take legally compliant rest breaks.

## C.   Summary Judgment on Plaintiffs' PAGA Claims Is Inappropriate.

Defendants further contend they are entitled to summary judgment of Plaintiffs' PAGA claims based on the allegation that Plaintiffs did not wait 60 days after filing a PAGA notice with the LWDA before filing the instant lawsuit. Such a position is contrary to relevant case law. The court's opinion in *Willner v. Manpower, Inc.*, 35 F. Supp. 3d 1116 (N.D. Cal. 2014) is applicable as to this point. The defendant in *Willner* moved for summary judgment as to the plaintiff's PAGA claims, contending that "Willner failed to exhaust her administrative remedies because she allegedly failed to give notice to Manpower of its violations of [Labor Code] section 226(a)." *Id.* at 1135. The court denied Manpower's motion for summary judgment as to Willner's PAGA claims, noting that "[a]t this stage of the litigation, untimely notice cannot be a dispositive issue," and emphasizing that Manpower "never moved to dismiss Willner's PAGA claims for failure to exhaust administrative remedies." *Id.* at 1135, 1135 n.10.

The Eastern District has also recognized that "[f]ederal courts applying PAGA have[] excused strict compliance with section 2699.3's notice and exhaustion requirements and have considered a PAGA claim despite delayed notice to the LDWA." *Garnett v. ADT, LLC*, 139 F. Supp. 3d 1121, 1127 (E.D. Cal. 2015). In one case addressed in *Garnett*, the plaintiff pled a PAGA claim in her complaint but failed

1    to send notice to the LWDA until *six months later*. *Id.* (citing *Harris v. Vector Mktg.*

2    *Corp.*, No. 08-5198, 2010 U.S. Dist. LEXIS 5659, at *2–4 (N.D. Cal. Jan. 5, 2010)).

3    The court determined that delayed notice to the LWDA was not a dispositive issue, and

4    that the essential purpose of the notice and exhaustion requirement had been satisfied

5    by virtue of the agency having had a chance to investigate the alleged violations. *Id.*

6    The *Harris* court also noted that the employer could have moved to dismiss the PAGA

7    claim earlier, but that the problem had since, in essence, been cured. *Id.*

8         Strict compliance with PAGA's notice and exhaustion requirements is not

9    necessary, and any potential defect has been cured by virtue of the LWDA being

10   provided with the opportunity to investigate Plaintiffs' claims. Moreover, Defendants

11   never moved to dismiss Plaintiffs' PAGA claims—or any of Plaintiffs' claims. Instead,

12   Defendants waited until the summary judgment stage to attempt to discard Plaintiffs'

13   PAGA claims. Here, as in *Willner*, *Garnet*, and *Harris*, Defendants are not entitled to

14   summary judgment as to Plaintiffs' PAGA claims.

15   **D.    Summary Judgment on the Remainder of Plaintiffs' Claims Is Improper.**

16        Defendants do not argue any independent basis upon which summary judgment

17   is warranted with respect to Plaintiffs claims for Defendants' failure to pay waiting time

18   penalties, failure to provide accurate itemized wage statements and for violations of

19   California Unfair Competition Law. Instead, Defendants merely argue that these claims

20   fail based on Defendants' request for summary judgment on Plaintiffs' claims for meal

21   and rest break violations and unpaid overtime. Accordingly, summary judgment is

22   likewise inappropriate with respect to these claims.

23                           **IV.   CONCLUSION**

24        For the foregoing reasons, Defendants are not entitled to summary judgment as

25   to any of Plaintiffs' claims, and this Court should deny Defendants' Motion.

26   Dated: September 11, 2017              WILLS LAW FIRM, PLLC
                                           By: */s/ Rhonda H. Wills*
27                                         Rhonda H. Wills
28                                         Counsel for Plaintiffs

1

## **CERTIFICATE OF SERVICE**

2

3

   I certify pursuant to 28 U.S.C. § 1746 that on September 11, 2017, I served the foregoing document on all counsel of record via the Court's CM/ECF filing system.

4

   I certify under penalty of perjury that the foregoing is true and correct.

5

6

Dated:  September 11, 2017

7

8

                                      */s/ Rhonda H. Wills*
                                      Rhonda H. Wills

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28